D/F

FILED Rec'd 8/24/12
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 21 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

TREVAUGHN HALL,

               Petitioner,

-against-

ANDREW W. EVANS, Chairman and CEO New York
State Division of Parole

               Respondent.
------------------------------------------------------------------- X

10-CV-5972 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION & ORDER

ROSS, United States District Judge:

On December 8, 2005, Trevaughn Hall ("petitioner") was convicted in the Supreme Court of the State of New York, Kings County, of two charges of manslaughter in the second degree stemming from a December 5, 2004 automobile collision in Brooklyn, New York. Represented by counsel, petitioner has filed a petition for a writ of habeas corpus challenging the convictions pursuant to 28 U.S.C. § 2254 and claiming that he was denied his Sixth Amendment right to the effective assistance of counsel by virtue of his attorney's introduction of evidence of recklessness at trial. For the reasons stated below, petitioner's application is denied.

## BACKGROUND

At approximately 10:25 p.m. on December 5, 2004, on Gateway Drive, a road adjacent to Brooklyn's Gateway Mall, a head-on collision occurred between a red Honda, driven by petitioner, and another vehicle, driven by Lorris Caynes. Petitioner's sole passenger, Moses Rivera, was killed. Mr. Caynes and his three passengers—Cynthia Franklin and her daughters, Anaya and Amalya—were injured to varying degrees. Amalya, four years old at the time, ultimately died from her injuries. Police arrested petitioner, a college student and a part-time

1

employee at the mall, for his role in the collision. He was eventually charged with two counts each of murder in the second degree (depraved indifference murder), manslaughter in the second degree (reckless manslaughter), and criminally negligent homicide.

Trial commenced on October 19, 2005. Trial Tr. at 1. The prosecution's case opened with testimony from police officers who had responded to scene of the collision. Detective Jack Herzlinger of the New York Police Department's ("NYPD") Emergency Services Unit testified that, on the night of December 5, 2004, he was called to a vehicle accident at Gateway Drive and Schenck, in Brooklyn, New York. Id. at 171, 173-74. Upon arrival, he observed two mangled vehicles, one red and one black, towards the middle of the street. Id. at 174. The driver of the black car was badly pinned, and the passenger of the red car was dead. Id. at 174-75. The little girl in the back seat of the black car was not wearing a seat belt and was pulled out of the vehicle by the members of the fire department. Id. at 175, 181. Photographs of the vehicles involved in the accident were introduced into evidence. Id. at 178.

NYPD Officer Scott Lynster testified that, at approximately 10:25 p.m., he and his partner received a call alerting them to a vehicle accident and responded to the scene. Id. at 191-92. While there, he spoke with petitioner, who identified himself as the driver of the red car; said that his friend and co-worker, Moses, had been in the car with him; and stated that he was coming from work at the mall. Id. at 193-94. The officer checked the car for alcohol, drugs, or other items that could have contributed to the accident but found nothing. Id. at 194-95. After talking with accident investigation squad staff, Officer Lynster placed petitioner under arrest for manslaughter in the second degree. Id. at 200, 213. Officer Lynster testified that the speed limit on Gateway Drive was an un-posted thirty miles per hour, that the street was well lit, and that Gateway Mall closes between 10:00 and 11:00 p.m. during the holiday period. Id. at 198-99.

The prosecution also called both the adult passenger and the driver of the black car involved in the collision. Cynthia Franklin stated that, on the night of the accident, she was going to the Gateway Mall Target, which closed later than normal because it was the holiday season. Id. at 236. In the car with her were her two children, Anaya and Amalya, and Anaya's father, Lorris Caynes, who was driving at a speed of roughly twenty to thirty miles per hour. Id. at 236, 238. Neither of the children was wearing a seatbelt. Id. at 237. Ms. Franklin did not see other cars out on the road that night and only remembered seeing a bright light in front of her and then smelling smoke and being pinned into the car. Id. at 238-39, 249-50. Having suffered several broken bones, she was taken to the hospital and underwent surgery. Id. at 241-42. Her daughter Anaya sustained injuries to her face, a fractured arm, and a lump in her leg. Id. at 242-43. Her daughter Amalya suffered a fractured skull and was put on life support before passing away. Id. at 243. Lorris Caynes also testified as to his recollections of the accident and the injuries he sustained. Tr. 458-489. He admitted to having driven without a driver's license, an offense for which he was subsequently arrested and to which he pled guilty. Id. at 464. He also pled guilty to a charge related to the children's not wearing seatbelts. Id. At the time of the accident, Mr. Caynes did not have a license because it was expired and suspended due to three infractions, including one involving child support. Id. at 469.

The prosecution also called Ronika Wilson as a witness. Mr. Wilson stated that he was working at BJ's, a store located in the Gateway Mall, on the date of the accident. Id. at 276. He testified that he left work with a co-worker, Crystal Butler, at approximately 10:15 that evening and that the rest of the mall was likely already closed. Id. at 283-84. On his way to his car, he saw two vehicles speeding, at about eighty miles an hour, "basically side by side" on Gateway Drive. Id. at 285, 288. He commented to Ms. Butler that, "there they go racing, drag-racing."

Id. at 348. The cars were coming around a corner, going north, and the red car was driving in the wrong lane. Id. at 286-89, 333. The cars passed him and he turned his head to continue observing them for another two or three seconds. Id. at 290. Mr. Wilson then continued walking to his vehicle and then heard a screech and a bang. Id. He turned and saw the lights of one car continuing northward. Id. at 291. Mr. Wilson finished walking to his car, got in, and drove in the direction that the cars had been going when they passed. He saw the accident and stopped to see if anyone was alive. Id. Ms. Butler stayed in the car. Id. at 293. Mr. Wilson testified that he stayed at the scene for about fifteen or twenty minutes before leaving and that he talked to a police officer while there. Id. at 370-76. Mr. Wilson stated that he later approached the police at the urging of a work colleague and that he gave a written statement to the district attorney as part of his participation in the grand jury process.[1]

Mr. Wilson admitted to having pled guilty to identity theft in the third degree in January 2004. Id. at 275. On cross-examination, he explained that his conviction stemmed from his using a customer's credit card, in November 2003, to pay for merchandise from Home Depot, where he was working as a cashier at the time. Id. at 312-14. He admitted that he was originally charged with grand larceny but that the charge was reduced to a misdemeanor as the result of a plea bargain. Id. at 314-15. Mr. Wilson was put on probation following his guilty plea. Id. at 315. A month before his testimony, Mr. Wilson's probation was cancelled early because there had been no further arrests or convictions. Id. at 316-18.

Detective Patrick J. Rooney of the NYPD Highway District Accident Investigations Squad testified as an expert in accident investigation and reconstruction. Id. at 409. He

---

[1] In its charge to the jury, the trial court noted that no written statements had been produced and that "an adverse inference should be drawn against the prosecution on account of this missing evidence" because the statement "could have contained information that would not support or perhaps even contradict the testimony of Mr. Wilson at this trial." Id. at 667.

4

discussed the difference between skid marks, which are made when a vehicle goes straight forward, and yaw marks, which are made when the tires of a vehicle roll forward while the vehicle is sliding out to the side. Id. at 412-14. He testified that he determined that the accident had been head-on and that red Honda had left a yaw mark prior to the accident, when it was coming out of a right curve and going into a left curve. Id. at 416-17. Detective Rooney stated that, based on his assessment of the yaw mark, the red Honda had been traveling at 80.24 miles per hour at the time it made the yaw mark and that the car would have been going a little faster beforehand. Id. at 425, 427. He stated that the marks present indicated that petitioner's brakes had not been applied. Id. at 426-27.

On cross-examination, Detective Rooney testified that a car's master cylinder does not always show evidence of a problem with one's brakes before going out. However, according to Detective Rooney, if the master cylinder were to go, there would be enough pressure built up within the system that a driver would have about two or three good pumps left with which to slow down one's vehicle. Id. at 440-41. He stated that he did not speak with petitioner about possible mechanical problems with his car or take petitioner's statement in that regard. Id. at 442-43.

Family members of the victims also testified, as did an expert in forensic pathology, who discussed the victims' cause of death. At the close of the case-in-chief, petitioner's counsel moved for a judgment of acquittal on the second degree murder and manslaughter charges. Id. at 537-39. The trial court denied that application. Id. at 540.

The defense then presented its case. Eric Cumberbatch, a good friend of petitioner's since elementary school, testified that petitioner left his house at 7:00 p.m. on the day of the accident and that he next saw petitioner in the hospital the following week. Id. at 553-54. Silas

Plunket, a mechanic with approximately forty years of experience, testified that he had known petitioner from church for about ten years. Id. at 556-59. He stated that, in September of 2004, petitioner brought over a recently-purchased red Honda Accord for Mr. Plunket to look over. Id. at 559-60. Mr. Plunket checked the car's brake and told petitioner to take the car back if he had a warranty on it. Id. at 560. He testified that the car's master cylinder was not correctly holding pressure, but that, if one eased one's foot off the brake and hit it again, the brake would stop. Id. at 561. According to Mr. Plunket, if there were a problem with the master cylinder and the brake was hit, there would not be any skid marks. Id. at 563. On cross-examination, Mr. Plunket stated that, if the master cylinder failed, one could still pump the brake; that petitioner's car had a type of brakes that prevents skidding; and that the parking brake is a separate brake. Id. at 563-67, 570. He also testified that he would not drive petitioner's car at eighty miles an hour with the brakes as he found them. Id. at 569. On redirect, Mr. Plunket said that he did not know if petitioner had taken his car to be fixed and that the parking brake could not be used when traveling fast. Id. at 571-72. The defense also introduced a videotape of Gateway Drive.[2] Id. at 574. Petitioner elected not to testify.

Immediately prior to summations, petitioner's counsel requested that the prosecution be precluded from arguing that petitioner never took the car to be fixed after being told that it had defective brakes. Id. at 593-95. According to petitioner's counsel, she had provided the prosecution with documentation that petitioner had taken the car in to have the brakes checked and that nothing was found to be wrong with them at that time. Id. at 593. The prosecutor responded that he would not argue that petitioner never brought the car into the dealer but that he would "certainly address the issue of the brakes, and how that would add to the awareness of risk." Id. at 592. The trial court commented that it was "a little perplexing" why petitioner's

---

[2] The trial court denied petitioner's application for the jury to visit the scene of the accident. Id. at 506.

counsel had offered evidence that petitioner had defective brakes if they were looked into before the incident and found to have nothing wrong with them. Id. at 595. The court stated that it could not tell the prosecutor not to argue, from the evidence presented, that petitioner's brakes were defective, at which point petitioner's counsel clarified that she did not oppose such argumentation but would object to the prosecutor's asserting that petitioner never took the car to be repaired. Id. at 595-96.

In summation, defense counsel discussed how the prosecution's witnesses had contradicted one another in various respects. Focusing on Mr. Wilson, the "key witness in the case," petitioner's counsel reminded the jury that he had been convicted of identity theft, pointed out that Mr. Wilson's purported written memorialization of his discussions with the police and district attorney had not been produced, and portrayed him as someone who was falsely "ingratiating himself into the status of the hero." Id. at 610-12, 626-29. She also argued that Mr. Wilson's testimony was unbelievable in light of the physical and forensic evidence. Specifically, she asserted that Mr. Wilson's testimony that he saw petitioner's car in the southbound lane was inconsistent with the accident reconstruction expert's testimony that petitioner's car had been in the northbound lane immediately prior to the collision, which occurred when he veered into the southbound lane. Id. at 632. She argued that the jury could not credit both of versions of the events. Id. at 633-34. Ending her summation, petitioner's counsel portrayed the collision as a "tragic accident" involving "a vehicle going at a high rate of speed, and nothing more," and she suggested that there had been no indication of braking action on petitioner's part because there was a problem with his car's brakes. Id. at 632, 634-36.

In its summation, the prosecution argued that the collision was not an accident but was the product of petitioner's choices. Id. at 638. He asserted that petitioner chose to drag race in a

car that was relatively new to him at the mall where he worked and at a time that petitioner knew people were leaving. Id. at 638-39. The prosecutor emphasized that petitioner was going at an undisputed eighty miles per hour in a thirty-mile-an-hour zone. He argued, contrary to the defense's argument, that the testimony of Mr. Wilson and the accident reconstruction expert were reconcilable because their testimony pertained to different portions of Gateway Drive. Id. at 647-48. In this regard, the prosecutor surmised that, when petitioner was passing Mr. Wilson, petitioner's car was coming out of a "very tough curve to make at 80 miles an hour," which he took wide, and noted that the yaw marks, indicating that petitioner veered from the correct lane, started further up the road. Id. at 648.

As relevant to the instant petition, the prosecutor also discussed the significance of Mr. Plunket's testimony. The prosecutor noted that Mr. Plunket had not been declared an expert and disparaged his knowledge of braking systems. Id. at 654. However, the prosecutor stated that, to the degree that the jury credited that witness's testimony, it was damaging to petitioner, insofar as Mr. Plunket testified that he would not have driven petitioner's car with the brake problem he found. Id. at 654. The prosecutor argued that, in this regard, petitioner's own witness had provided "another element of how reckless [petitioner] was":

> They are throwing out a nonissue. They are trying to throw out the brakes. Brakes don't get you to 80 miles an hour. Whether he did or didn't use brakes, that's got nothing to do with the level of speed. But they are going to throw that out there, and think it is a distraction, but it turns out it bites them back. Because if the brakes ain't working well, he shouldn't have been driving like a maniac like he was.

Id. at 655; see id. at 658, 661. The prosecutor asserted that the mechanic's testimony was one of several independent reasons for which the jury should return a guilty verdict.

The jury deliberated for approximately two and a half days before acquitting petitioner of the second-degree murder charges and finding him guilty of two counts of second-degree

8

manslaughter. At subsequent sentencing proceedings, petitioner's counsel orally moved to set aside the verdict on the ground, inter alia, that the prosecutor improperly commented during summation on evidence he knew to be false, i.e., that he stated petitioner knew the brakes to be faulty. Sentencing Tr. at 2-6. The trial court denied petitioner's motion, concluding that the prosecutor did nothing to warrant a mistrial. The court sentenced petitioner to two concurrent prison terms of three to nine years.

Defendant appealed his conviction to the Appellate Division of the New York State Supreme Court, Second Division, which affirmed the judgment in a decision dated December 22, 2009. People v. Hall, 892 N.Y.S. 2d 457 (N.Y. App. Div. 2d Dep't 2009). The court found, in relevant part, that petitioner was not denied the effective assistance of counsel because, under the circumstances and in light of the prosecution's case, petitioner's counsel "pursued a logical defense strategy and successfully obtained acquittals on the two higher counts charging murder in the second degree." Id. at 458. The court further determined that, considering the record as a whole, "defense counsel provided meaningful representation." Id. Petitioner sought leave to appeal to the New York Court of Appeals, which denied his request in a certificate dated March 8, 2010. People v. Hall, 14 N.Y.3d 800 (2010). Defendant was paroled on June 18, 2010. He filed the instant petition on December 22, 2010.

## DISCUSSION

### I. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

## II. Petitioner's Ineffective Assistance of Counsel Claim

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated. See Harrington, 131 S. Ct. at 780. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under

10

"prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 698. The court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, and "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did," Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted). "In evaluating whether the proceeding would have been different but for counsel's error, '[t]he likelihood of a different result must be substantial, not just conceivable.'" Yannotti v. United States, 2012 U.S. App. LEXIS 7616 (2d Cir. N.Y. Apr. 17, 2012) (quoting Harrington, 131 S. Ct. at 792).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). In order to prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Harrington, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or, if it did, that petitioner was not prejudiced as a result. See id. Such is the case even where the state court decision makes no explicit reference to Strickland. Cf. Rosario v. Ercole, 601 F.3d 118 (2d Cir. 2010); Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001).

In the instant case, petitioner argues that he was denied the effective assistance of counsel when his attorney presented evidence indicating that he was aware that his brakes were faulty at the time of the collision. According to petitioner, his guilt could not have been established without that evidence or, at a minimum, there is a reasonable probability that, but for counsel's error in this regard, the results of the trial would have been different. See Pet'r's Mem. at 17, 30 (citing Strickland, 466 U.S. at 694). Although it is not inconceivable that the jury might have reached a different decision absent the testimony of petitioner's mechanic, this court cannot find that the state court was unreasonable in concluding that there was no substantial likelihood that, but for counsel's allegedly deficient performance, the result of the proceeding would have been different.[3] Petitioner's request for relief must, therefore, be denied.

Petitioner's argument that it was unreasonable for the state court to determine that there was no significant probability that petitioner suffered prejudice is dependent, in large part, on his portrayal of the prosecution's case as weak. In this regard, he likens the evidence in his case to that found legally insufficient to establish criminally negligent homicide in People v. Cabrera, 10 N.Y.3d 370 (2008). There, the court reversed the convictions of a seventeen-year-old driver who had killed three of his passengers when, driving a group of friends on a rural road, he failed to heed a posted forty-mile-an-hour sign on a curved road, continued speeding at approximately seventy miles per hour, and failed to negotiate a turn. Id. at 372-75. In finding the evidence insufficient to establish defendant's guilt in that case, the court found lacking "a morally blameworthy component to excessive speed," as was necessary to support a finding of criminality. Id. at 378. Specifically, it held that, in order for criminal liability to attach, "it takes

---

[3] Because the court finds that petitioner has not sufficiently established his entitlement to relief under Strickland's prejudice prong, the court declines to address whether trial counsel's performance fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").

12

some additional affirmative act by the defendant to transform 'speeding' into 'dangerous speeding'; conduct by which the defendant exhibits the kind of 'serious[ly] blameworth[y]' carelessness whose 'seriousness would be apparent to anyone who shares the community's general sense of right and wrong.'" Id. at 377 (quoting People v. Boutin, 75 N.Y.2d 692, 696 (1990)). Here, petitioner argues that counsel's introduction of evidence erroneously suggesting that petitioner knew his brakes to be faulty at the time of the collision was the only credible evidence of morally blameworthy conduct capable of sustaining petitioner's conviction because, without it, the prosecution had only established that petitioner was speeding. Absent counsel's error, petitioner asserts, he would have been acquitted of both the second-degree manslaughter and criminally negligent homicide charges.

The court cannot agree with petitioner's argument, as it was not unreasonable, on this record, for the state court to conclude that petitioner suffered no prejudice from counsel's alleged error. See Strickland, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The evidence showed that petitioner was driving in excess of eighty miles per hour on a road he knew to be curved and possibly in use by other mall employees and customers at the time. While such evidence alone may not have been strong enough to support a finding that there was no reasonable probability that counsel's introduction of Mr. Plunket's testimony affected the verdict, the evidence also demonstrated that petitioner had been drag racing in the wrong lane of traffic before returning briefly to the correct lane, from which he then swerved. This evidence was, beyond doubt, sufficient to support defendant's second-degree manslaughter conviction. See N.Y. Penal Law § 125.15 ("A person is guilty of manslaughter when . . . he recklessly causes the death of another person[.]"), § 15.05 (defining "recklessly" as being "aware

of and consciously disregard[ing] a substantial and unjustifiable risk"); People v. Hart, 778 N.Y.S.2d 94 (finding evidence of defendant's participation in 85 mile per hour drag race that weaved in and out of traffic lanes on suburban streets sufficient to support second degree manslaughter conviction for the death of his drag race competitor and driver of a third car); People v. Williams, 677 N.Y.S.2d 366 (App. Div. 2d Dep't 1998) (finding defendant's swerving into a victim after driving backward at 45 miles per hour on a one way street towards group of people that defendant has just left sufficient to establish a prima facie case of second degree manslaughter).

Petitioner argues that Mr. Wilson's drag racing testimony cannot be credited because it was "refuted by the unassailable forensic evidence" introduced by Detective Rooney that petitioner was in the proper lane of traffic immediately prior to the collision. Pet'r's Mem. at 21-22. However, the evidence offered by these two witnesses about the position of petitioner's car on the road is not per se contradictory, and the record does not otherwise show that it is physically irreconcilable, as petitioner asserts to be the case. Thus, viewed in the light most favorable to the prosecution, as is required on collateral review, the evidence showed that petitioner was drag racing and changing lanes before the collision. In light of such highly probative evidence of recklessness presented by the prosecution, the state court's determination that petitioner was not prejudiced, for Strickland purposes, by his counsel's alleged error in introducing Mr. Plunket's testimony cannot properly be deemed unreasonable. See Harrington, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Habeas relief is, consequently, not available.

## CONCLUSION

The petition for a writ of habeas corpus is denied. Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

S/Judge Ross

Allyne R. Ross
United States District Judge

Dated: August 21, 2012
Brooklyn, New York